**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RICARDO SMITH,**

               **Plaintiff,**

     **v.**                            **5:10-CV-84**
                                     **(NAM)**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

               **Defendant.**
_____

**APPEARANCES:**                            **OF COUNSEL:**

Legal Services of Central New York, Inc.     Christopher Cadin, Esq.
472 South Salina Street, Suite 300
Syracuse, New York 13202
_For Plaintiff_

Mary Ann Sloan                        Peter W. Jewett,
Acting Regional Chief Counsel         Special Assistant U.S. Attorney
Social Security Administration
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_For Commissioner_

**Hon. Norman A. Mordue, U.S. District Judge**

### MEMORANDUM DECISION AND ORDER

**I.**       **INTRODUCTION**

     Plaintiff Ricardo Smith brings this action under the Social Security Act, 42 U.S.C. §§

405(g) and 1383(c)(3), seeking judicial review of the decision by defendant Michael J. Astrue,

Commissioner of Social Security, to deny his application for supplemental security income.

Plaintiff alleges that he has been disabled since December 15, 1996, due to blindness of the left

eye, internal derangement of the right knee, facet disease of the lumbosacral spine, a herniated

disc, spondylolisthesis, and an aneurysm.

On October 24, 2003 plaintiff filed an application for benefits under the Social Security

Act.  After his initial application was denied plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  ALJ Elizabeth Koennecke held a hearing on February 2,

2005.  T. 452.  Plaintiff appeared at the hearing with his attorney.  T. 452.  On March 27, 2005,

the ALJ issued a decision denying plaintiff's application.  T. 18.  On July 24, 2006, the Appeals

Council vacated the decision and remanded the case to the ALJ with directions: to evaluate

plaintiff's work activity in 2005 to determine whether plaintiff performed substantial gainful

work activity; to obtain additional evidence concerning plaintiff's physical impairments; and to

obtain opinions from medical and vocational experts.  T. 97-98.  The Appeals Council also

directed the ALJ to offer plaintiff a second hearing.  T. 99.

On June 21, 2006, while the case was pending before the Appeals Council, plaintiff

protectively filed a second application for supplemental security income.  T. 18.  This application

was denied in a notice of initial determination dated September 19, 2006, and was consolidated

with the claim remanded by the Appeals Council.  T. 18.

Because of plaintiff's incarceration, the second hearing was delayed until July 7, 2008,

and held via "video teleconferencing".[1]  T. 401-44.  The ALJ presided over the hearing in

_____

[1]The regulations state that hearing appearances may be made by video teleconferencing:

In setting the time and place of the hearing, we will consult with the administrative
law judge in order to determine the status of case preparation and to determine
whether your appearance or that of any other party who is to appear at the hearing
will be made in person or by video teleconferencing. The administrative law judge

Syracuse, New York.  T. 403.  Plaintiff testified from the Ogdensburg Correctional Facility via video teleconference.  T. 403.  He was represented by Laura Weekly.[2]  T. 403.  Medical Expert Thomas Weiss, M.D., testified via telephone.  T. 403.  Vocational Expert David Festa appeared and testified in Syracuse.  T. 403.

On October 24, 2008, the ALJ issued a decision denying plaintiff's applications.  T. 18-25.  On November 25, 2009, the Appeals Council denied plaintiff's request for review making the ALJ's decision the final decision of the Commissioner.  T. 7.  This action followed.

## II.    MEDICAL EVIDENCE

The following is a chronological summary of the medical records in the Administrative Transcript.  In a note dated January 6, 1997, Jeffrey Stern, M.D., a retina - vitreous specialist, stated:

> Ricardo Smith is a patient of mine who underwent major eye surgery on December 17, 1996 for a retinal detachment.  A pars plana vitrectomy and scleral buckle were performed on his left eye.  Multiple surgeries will most likely be needed on his eye.  In addition, the prognosis on his left eye for visual recovery is limited.  On his last visit to our office on December 30, 1996, visual acuity was at light penetration only.

T. 243.

Alexander Filipp, M.D., from The Center for Sight, examined plaintiff on February 28, 1997.  In his report, Dr. Filipp noted that plaintiff was a "professional boxer who sustained a

---

will determine that the appearance of a person be conducted by video teleconferencing if video teleconferencing technology is available to conduct the appearance, use of video teleconferencing to conduct the appearance would be more efficient than conducting the appearance in person, and the administrative law judge determines that there is no circumstance in the particular case that prevents the use of video teleconferencing to conduct the appearance.

20 C.F.R. § 416.1436(c).

[2]Ms. Weekly identified herself in her letters to the ALJ as a "Law Graduate".  T. 116.

3

retinal detachment" of the left eye and had "surgery with silicone oil instillation." T. 242.

Plaintiff asked Dr. Filipp "whether anything could be done to improve the vision" in his left eye.

T. 242. Dr. Filipp found that plaintiff had "questionable no light perception [left eye]" and that

the visual acuity in his right eye was 20/30 without correction. T. 242. Dr. Filipp told plaintiff

that the retina in his left eye had "suffered significant damage" and that "the prognosis for any

improvement . . . was extremely poor." T. 242.

A State of New York - Department of Correctional Services ambulatory health record

dated September 9, 2003 stated that plaintiff "slipped on wet floor in bathroom" and that he had

"chronic back problems" and was "having pain and difficulty using RT leg" as well as

"numbness". T. 261. Plaintiff was given a "cane until [could be] seen by M.D." T. 261.

On December 8, 2003, at the Commissioner's request, Berton Shayevitz, M.D. performed

a consultative internal medicine examination. Plaintiff told Dr. Shayevitz that "he had pain in the

lower lumbar area occasionally radiating to the right sacroiliac area" and that the pain was

"constant and the intensity varie[d]." T.251. Plaintiff's vision was less than 20/200 on the right

and 20/40 on the left. T. 252. Dr. Shayevitz reported that plaintiff's gait was normal and that he

could walk "on heels and toes without difficulty." T. 253. Dr. Shayevitz found that plaintiff had

full flexion of the lumbar spine and "full range of motion of shoulders, elbows, forearms, . . .

wrists, . . . hips, knees, and ankles." T. 254. Dr. Shayevitz reported that:

> Forward flexion is 0-45 degrees without discomfort, extension is 0-45 degrees
> causes pain in the mid upper neck bilaterally, lateral flexion is 0-45 to the right
> causes pulling on the right side of the neck to the right with no discomfort and
> bilateral rotation is 0-70 degrees limited by stiffness.

T. 253. Dr. Shayevitz listed the following under "Impression":

1. Complaints of low back pain without having abnormal physical findings.

4

2.      Bilateral pes planus.
3.      Total loss of vision in the right eye.
4.      Possible degenerative changes in the neck.

T. 245.  Dr. Shayevitz stated:

> He is limited at this point only in loss of use of his right eye.  It might be
> somewhat of a problem in activities involving driving or rapid repetitive motions
> requiring vision of the right [eye].  He may be between mildly and moderately
> limited if at all by his back.

T. 254.

In a radiology report dated December 8, 2003, Pesho S. Kotval, M.D., Ph.D. stated that a lumbar sacral spine x-ray showed: "Disc space narrowing at L5-S1 and Grade II spondylolisthesis of L5-on-S1."  T. 256.[3]

On January 30, 2004, plaintiff went to the emergency room at Community General Hospital in Syracuse, New York for medical treatment after slipping on ice.  Plaintiff told Phillip Tatnall, M.D., that he recently "was released from prison where he had multiple back problems" but that he had been doing "quite well until he slipped on ice this morning, and has redeveloped numbness and tingling in his right leg".  T. 265.  Dr. Tatnall examined plaintiff's back and found "pain on percussion of L3-L4."  T. 265.  Dr. Tatnall observed that plaintiff could "heel and toe walk" but that he did so "with great difficulty".  T. 265.  Dr. Tatnall diagnosed "acute exacerbation of low-back pain with herniated disc by history" and prescribed Lortab and Flexeril.  T. 265.

On February 10, 2004, plaintiff returned the Community General Hospital emergency room to obtain treatment for back and leg pain.  T. 273, 279.  Plaintiff was given Tylenol, Motrin and ice packs.  Plaintiff was discharged the same day with a prescription for Lortab and instructed

---

[3]There is a line drawn over the report and "excluded" written on it.  T. 256.

to follow-up with his physician.  T. 273; *see also* T. 275-76.

Joseph Smith, M.D., an orthopedist at Syracuse Orthopedic Specialists, examined plaintiff on April 28, 2004.  T. 304.  Plaintiff told Dr. Smith that he had pain in his right knee and leg and that he had injured his knee in 1997 while playing basketball and since then had intermittent episodes of his right knee "giving out, most recently, approximately two weeks ago, while playing" basketball.  T. 304.  Dr. Smith observed that plaintiff's gait was hesitant and that there was "tenderness to palpation at the medial joint line and medial collateral distally".  T. 305.  The range of motion in plaintiff's right knee was "[n]early normal . . . limited, probably by pain rather than a mechanical block."  T. 305.  Dr. Smith diagnosed "[l]ong chronic third-degree ACL deficiency, right knee . . . [m]inimal medial collateral ligament strain."  T. 306.  Dr. Smith requested an MRI of plaintiff's right knee.  T. 306.  Dr. Smith stated in his report that plaintiff was: "Temporarily TOTALLY disabled.  Partial disability moderate."  T. 306.  Dr. Smith also gave plaintiff a note stating:  "Pt. is to be out of work until further notice [diagnosis] knee pain."  T. 285.

On May 12, 2004, Dr. Smith issued a "physician's statement for determination of employability".  T. 286.  Dr. Smith stated that plaintiff could not perform any activity and was "temp[orarily] totally disabled" because he had "pain in extremity" and "deficiency lower limb".  T. 286.  Dr. Smith also stated that an M.R.I. had been requested.  T. 287.

A radiology report dated July 3, 2004 states that four views of plaintiff's right knee were taken and that they showed a "small joint effusion".  T. 316.

In a residual functional capacity assessment dated July 21, 2004, Heather Crandell, a physician assistant, who was treating plaintiff's knee condition, *see* T. 294, stated that in an eight

hour work day, plaintiff could sit for two hours, stand and walk for less than one hour, and "sit/stand/walk combination" for six hours.  T. 288.  Crandell indicated that plaintiff could bend, stoop, and twist "less than 1 hr." in an eight hour work day but could not kneel climb, or drive at all.  T. 288.  Crandell stated plaintiff could use his upper body to push and pull two hours each day and could lift ten pounds but that he could not carry anything.  T. 288.  Crandell also stated that plaintiff could use his hands to perform gross and fine motor activities, grasp, hold, turn, and, with support, reach forward three hours and "over chest" four hours each day.  T. 288.  Crandell cited "ACL insufficiency and possible meniscus tear" as the basis for her opinion.  T. 289.  Crandell indicated that sustained activities could cause plaintiff to regress physically and that his condition was likely to last more than a year "unless treated surgically".  T. 289.  Crandell stated that she believed that plaintiff's symptoms and complaints were reasonable.  T. 289.

On July 22, 2004, plaintiff told Mateen Awan, M.D., a primary care physician at Syracuse Community Health Center, that he had lower back pain, numbness in the right leg, and pain in the right knee.  T. 319.  Dr. Awan examined plaintiff and noted that he had "tenderness in the lumbosacral spine and the paraspinal muscles", that "[s]traight leg raise test is limited at about 40 degrees on the left and 30 degrees on the right", and that plaintiff had "decreased muscle power because of the pain in the knee and in the back on the right side."  T. 319.  Dr. Awan diagnosed lower back pain and right knee injury.  T. 319.

On July 27, 2004, plaintiff went to see Tamara Scerpella, M.D. at University Hospital Orthopedic Surgery regarding his right knee.  T. 293.  Dr. Scerpella noted that plaintiff had "a chronic A[nterior] C[ruciate] L[igament] tear (1998) sustained in an altercation with an officer" and diagnosed right knee ACL "chronic insufficiency with subacute medial meniscal tear."  T.

293.  Dr. Scerpella recommended surgical "intervention to treat the meniscus".  T. 293.  Dr. Scerpella gave plaintiff a note stating that she was treating "a meniscal and ACL tear of the [right] knee", that "surgery will be later this month" and that plaintiff would "be fully disabled for 3-4 w[eeks] post-surgery and permanently disabled (partial - light walking only) due to ACL tear."  T.

On July 29, 2004, plaintiff had arthroscopic partial medial and lateral meniscectomy surgery.  T. 294-95.

On August 4, 2004, during a post-surgery appointment, plaintiff told Dr. Scerpella that he was doing "very well", could ride a bike and had "much less pain than he did prior to surgery."  T. 292.  Dr. Scerpella recommended "referral to physical therapy to work on range of motion, strengthening and proprioceptive retraining."  T. 292.  Dr. Scerpella stated that plaintiff was "totally disabled at this time, but when he [returned] in one month he will likely be eligible for all but strenuous work".  T. 292.  Dr. Scerpella noted that plaintiff "obviously has other issues including left leg sciatica and the blindness in one eye" but they were "out of the realm of our expertise."  T. 292.

In a report dated September 7, 2004, Gerard McChohan, M.D. stated that an M.R.I. of plaintiff's lumbar spine had been done and showed:

> L5-S1:  Grade I spondylolisthesis measuring about 1.5 cm.  Suspected bilateral L5 pars defects, although correlation with radiographs is suggested.  Diffusely bulging desiccated disc and bilateral prominent facet joint disease.  Compression of intra foraminal exiting bilateral L5 nerve roots.
>
> L4-5:  Small central midline disc herniation superimposed over a mild diffuse disc bulge with some facet joint disease.  The exiting nerve roots do not appear compressed.

T. 326.

Plaintiff went to the University Hospital Orthopedic-Spine Clinic on October 15, 2004, where he was seen by Kenneth M. Johnson, III, M.D.  T. 302.  Plaintiff complained of numbness and radiating pain in his right leg.  T. 302.

Plaintiff returned to the Orthopedic-Spine Clinic on October 29, 2004.  T. 302-03.  Dr. Johnson noted that plaintiff could stand and walk but that his back was tender to palpation.  T. 303.  Based on an MRI, Dr. Johnson diagnosed spondylolisthesis, L5-S1 sublaxation, and disc herniation.  T. 303.  Dr. Johnson instructed plaintiff to continue taking pain medication and recommended physical therapy.  T. 303.

Plaintiff went to physical therapy three times between November 11, 2004 and December 15, 2004.  T. 309.

On December 2, 2004, Dr. Scerpella completed a "medical assessment to do work-related activities" for plaintiff.   T. 296.  Dr. Scerpella stated that plaintiff could lift up to twenty pounds continuously and twenty to fifty pounds frequently.  T. 296.  Dr. Scerpella stated that plaintiff could carry up to ten pounds occasionally.  T.296.  Dr. Scerpella stated that plaintiff could sit for eight hours and stand and walk for two hours in an eight hour workday.  T. 297.  Dr. Scerpella stated that plaintiff could never climb, balance, stoop, crouch, kneel, and crawl but that he could continuously reach, handle, feel, hear, and speak.  T. 298.  Dr. Scerpella stated that plaintiff could push and pull frequently as long as he was not standing.  T. 298.  Dr. Scerpella recommended that plaintiff avoid all heights and moving machinery because his knee instability increased his risk of falling.  T. 299.  Dr. Scerpella based her opinion on plaintiff's right "knee ACL insufficiency" and "ongoing instability".  T. 297.

On February 3, 2005, Mateen Awan, M.D. examined plaintiff at Syracuse Community

Health Center.  T. 318.  Plaintiff reported pain in his lower back and numbness in his right foot.
T. 318.  Dr. Awan noted that plaintiff "had an MRI done that showed some diffuse disc bulging
and some compression of the L-5 nerve."  T. 318.  Dr. Awan told plaintiff to continue taking
"pain medications" and Flexeril and that he would refer plaintiff to the Orthopedic-Spine Clinic.
T. 318.

On April 24, 2006, plaintiff went to an "emergency department"[4] seeking treatment for
back pain. T. 327.  David Reed, M.D. examined plaintiff and noted that plaintiff had lower
lumbar upper sacral discomfort and pain along his right buttock region.  T. 327.  Dr. Reed noted
that the straight leg test was negative but that plaintiff had "discomfort after lifting his right leg to
about 30 degrees".  T. 327.  Dr. Reed also noted that plaintiff's strength, reflexes and sensation
were good.  T. 327.  Dr. Reed prescribed Lortab and gave plaintiff a note excusing him from work
and instructions to follow up with the orthopedic clinic.  T. 327.

On May 26, 2006, plaintiff returned to the Orthopedic-Spine Clinic complaining of back
pain and radiculopathy.  T. 332.  Kyle Messick, M.D. examined plaintiff and found "mild
tenderness to palpation over the lower lumbar region in the midline", limited range of motion
with flexion and extension, and "globally decreased sensation to light touch over his right lower
extremity".  T. 332.  Dr. Messick noted that x-rays showed "the presence of spondylolysis at L5
without significant spondylolisthesis."  T. 332.  Dr. Messick recommended that plaintiff have an
M.R.I.  T. 332.

In a report dated June 8, 2006 from University Radiology Associates, Ja-Kwei Chang,

---

[4]The record of this visit does not identify the "Emergency Department".

M.D. stated that an M.R.I. of plaintiff's back showed degenerative disc diseases at the L4-L5 and L5-S1 level, facet osteoarthritis, and grade I anterolisthesis associated with spondylolysis, disc bulge, and left neural foraminal stenosis at the L5-S1 level.  T. 335.

On June 9, 2006, plaintiff returned to the Orthopedic-Spine Clinic for "follow-up back pain status post lumbar MRI."  T. 330.  Jaison James, M.D. found plaintiff  "was tender to palpation at the L5-S1 level both midline as well as laterally in the paraspinal region."  T. 330. Plaintiff could "flex to about 45 degrees and extend without much difficulty".  T. 330.  Dr. James stated the "distribution of numbness did not follow any particular dermatonal distribution" on his leg.  T. 330.  Dr. James noted that the "[s]traight-leg-exam on the right side with 15 degrees of flexion produced pain in the lumbosacral region midline" and that on the left side plaintiff "was able to flex his leg to about 45 degrees before this pain was noted."  T. 330.  Dr. James indicated that the M.R.I. showed: "spondylolisthesis at the L5-S1 level"; "loss of height at the L5-S1 vertebral disc"; "nonunion of the pars articularis" at L5, which  "may be causing irritation to the L5 nerve root"; mild degenerative changes of the L4-L5 root; and "questionable nerve root impingement on the left L5 nerve root."  T. 331.

On June 22, 2006, plaintiff began physical therapy.  T. 338.

On July 26, 2006, plaintiff went to the "Emergency Department" complaining of back pain.  T. 346.  Plaintiff reported to attending physician Elliot Rodriguez, M.D. that "he has been doing physical therapy but over the last couple of days his pain has become exacerbated and he has run out of his medications."  T. 346.  Dr. Rodriguez found plaintiff had some pain to palpation on his back and some diminished strength.  T. 346.  The straight leg test was positive on the right and negative on the left.  T. 346.  Dr. Rodriguez treated plaintiff with Lortab and

directed him to follow-up with the Orthopedic-Spine Clinic.  T. 346.

On August 2, 2006, Kalyani Ganesh, M.D. examined plaintiff at the Commissioner's request.  T. 348.  Dr. Ganesh noted plaintiff's chief complaints were blindness in the left eye, "surgery of the right knee," and chronic back pain.  T. 348.  Plaintiff told Dr. Ganesh that he wore a right knee brace all the time, that his right leg gave out "especially when he is climbing", that he had right knee pain all the time and that his knee "hurts when he does too much walking."  T. 348.  Plaintiff told Dr. Ganesh that he was supposed to have another surgery but provided no details.  T. 348.

In the report Dr. Ganesh noted that plaintiff complained that he had low back pain daily, that the pain increased with movement, and that he could not "do any lifting or carrying".  T. 348. Dr. Ganesh observed that plaintiff walked with a slight limp "favoring his right" leg and that he could not walk on his heels or squat but that he could walk on his toes.  T. 349.  Dr. Ganesh found plaintiff's cervical spine showed "full flexion, extension 25 degrees, lateral flexion 25 degrees" and full rotary movement.  T. 350.  Plaintiff's lumbar spine flexion was 45 degrees, extension 0 degrees, lateral flexion 10 degrees, and rotation 45 degrees "limited by pain."  T. 350.  The straight leg raise test was negative bilaterally.  T. 350.  Dr. Ganesh indicated that plaintiff had "decreased pinprick sensation below the right knee" and had "tenderness in the mid-spine, lumbar spine, and medial aspect of the right knee."  T. 350.

Dr. Ganesh issued the following medical source statement: "No gross limitation to sitting, standing, and the use of upper extremities.  Mild to moderate limitation to walking, climbing, lifting, carrying, pushing, and pulling."  T. 351.

A radiology report issued on August 2, 2006 by Pesho Kotval, M.D., Ph.D. states that the

lumbar sacral spine x-ray showed: "Grade I spondylolisthesis of L5 on S1 with the disc space being narrowed" and "[s]traightening of lordotic curve."  T. 352.

On September 13, 2006, a State Agency disability examiner issued a report opining that plaintiff could lift and carry ten pounds occasionally, stand and walk two hours in an eight hour workday, sit "about" six hours in an eight hour workday, push and pull ten pounds occasionally, climb, stoop, kneel, crouch, and crawl occasionally, and balance frequently.  T. 354-55.  In the area of "visual limitations" the disability examiner opined that plaintiff's field of vision was limited.  T. 355.

On August 4, 2006, plaintiff returned to the Orthopedic-Spine Clinic complaining of low back pain and right lower extremity numbness and tingling.  T. 383.  Michael S. Potter, M.D., sent plaintiff "to get a lumbosacral corset back brace" and told him to try a TENS unit.  T. 384.  Dr. Potter prescribed Motrin and Parafon forte.  T. 383.  Dr. Potter"felt that [plaintiff's] symptoms will improve with time" but that "he will not ever be able to return to being a manual laborer with his current spine injuries."  T. 384.

On August 16, 2006, plaintiff went to the "Emergency Department" complaining of neck pain and bilateral hand weakness.  T. 359.  Attending physician Lalainia Secreti, M.D., concluded that plaintiff's symptoms were "most likely attributable to spasm of the paraspinal muscles as well as the right trapezius muscle."  T. 361.  An M.R.I. showed "mild canal stenosis secondary to mild annular bulging at the C3-C4 and C4-C5 intervertebral levels."  T. 362.  Plaintiff was discharged with prescriptions for Percocet and Flexeril.  T. 361.

On August 18, 2006, plaintiff returned to the Orthopedic-Spine Clinic complaining of "neck pain with numbness of his right hand."  T. 381.  Dr. Potter stated that he believed plaintiff

"likely has carpal tunnel syndrome to his right hand" and "may also have some radiculopathy from his cervical neck." T. 381.  Dr. Potter referred plaintiff to the Pain Clinic and prescribed physical therapy. T. 382.

On September 6, 2006, plaintiff went to the emergency department at University Hospital complaining of "constant" lower back pain that worsened with movement and radiated "down his right leg." T. 377.  Attending physician N. Heramba Prasad, M.D. examined plaintiff and found the muscle strength in his lower extremities to be "5+/5 on the left and 4+/5 on the right." T. 377. Dr. Prasad stated in his report that plaintiff  "essentially is looking for some relief for his pain" and that there was no need "[a]t the present time . . . for any immediate intervention." T. 379.  Plaintiff was discharged with a prescription for Lortab.  T. 379.

On September 22, 2006, plaintiff returned the Orthopedic-Spine Clinic.  T. 374.  Plaintiff reported to Maria T. Iannolo. M.D., that his "pain has worsened over the last couple of months." T. 374.  Dr. Iannolo found that plaintiff had "numbness over the entire lower extremity" and "4/5 strength in the ilipsoas, quad, hamstrings, tibialis anterior, gastrocnemius, and E[xtensor H[allucis] L[ongus]". T. 374.  Dr. Iannolo prescribed Motrin and Zantac.  T. 375.

On October 13, 2006, plaintiff returned to the Orthopedic-Spine Clinic.  T. 372.  Jonathan Clabeaux, M.D. found that plaintiff had "some tenderness in upper T-spine as well as mid-lower back with minimal pain over L5-S1, paint with hypertension, and pain with forward flexion."  T. 372.  Dr. Clabeaux noted that plaintiff "has positive right straight leg raise with recreation of low-back pain and he has pain down the right leg."  T. 372.  Dr. Clabeaux also found plaintiff had "decreased sensation in the right leg compared to the left leg" and "3+ deep tendon reflexes bilateral lower extremities, which appear to be somewhat staged."  T. 372.  Dr. Clabeaux

14

diagnosed "mild spondylolysis and some very mild foraminal narrowing with right-sided leg pain." T. 372.

On November 27, 2006, plaintiff went to a primary care clinic because he needed "a referral from a primary care physician to be able to be accepted in the Pain Clinic." T. 370. Debra A. Buchan, M.D. examined plaintiff and noted that his only complaints were chronic lumbar back pain and chronic neck pain. T. 370. Dr. Buchan found plaintiff had "limitation of motion and lateralization of cervical spine, more towards the right" and that he was "[m]ild tender to palpation." T. 371. Dr. Buchan also found that "[p]alpation of the rest of the spine elicited mild tenderness on the lower thoracic spine as well as lumbosacral spine." T. 371. The "[l]eg raise exam elicited pain in the lower lumbar region with both legs." T. 371. Dr. Buchan prescribed Lortab and referred plaintiff to the Pain Clinic for treatment of his chronic lumbar and cervical pain. T. 371.

On March 12, 2007, returned to the primary care clinic complaining of right arm numbness. T. 368. Dr. Buchan stated that plaintiff had "sudden onset of right upper paresthesias combined with a painful discomfort sensation." T. 368-69. Dr. Buchan ordered a "STAT CT scan of the head" and M.R.I. of the neck and noted that plaintiff was scheduled to be seen at the Pain Clinic "this Friday for further management of his chronic lumbar and cervical pain." T. 369.

On March 16, 2007, plaintiff went to the Pain Clinic at University Hospital seeking relief for "[c]hronic neck and low back pain." T. 366. Plaintiff was seen by Donna-Ann Thomas, M.D. and Amir Mian, M.D. T. 366-67. They assessed "cervical and lumbar radiculopathy", and discussed "lumbar epidural steroid injection" with plaintiff as well as the risks and benefits of neuropathic pain medication and anti-inflammatory medication. T. 366.

15

To the extent decipherable, a progress note dated March 28, 2007, by Craig T. Montgomery, M.D., Ph.D., a neurosurgeon, indicates that a CT scan of plaintiff's head showed an area that "most likely represents an aneurysm."  T. 365.  An addendum to a medical note by Dr. Buchan states that the CT scan showed "1.1 cm aneurysm at the right distal internal carotid artery".  T. 369.

On December 12, 2007, plaintiff met with David J. Padalino, M.D., a neurosurgeon, regarding the aneurysm identified in a CT angiogram.  T. 399.  Dr. Padalino recommended "formal cerebral angiogram and/or possible G[uglielmi] D[etachable] C[oil] coiling versus operative clipping of this aneurysm".  T. 400.

On February 20, 2008, plaintiff met with Yan Michael Li, M.D., a neurosurgeon, to discuss the results of the CT angiogram and diagnosis of right internal carotid artery aneurysm. T. 397.  Dr. Li, like Dr. Padalino, indicated that the next step was to schedule a cerebral angiogram.  T. 397.

On March 17, 2008, plaintiff had a cerebral angiography.  T. 392.  A "small left middle cerebral artery bifurcation aneurysm" was also identified during the procedure.  T. 393.

On April 30, 2008, plaintiff met with Mohamed M. Abdulhamid, M.D., neurosurgeon, to discuss how to manage the cerebral artery terminus aneurysm, including "aneurysm coiling versus aneurysm clipping."  T. 395.  Dr. Abdulhamid indicated that plaintiff would have to meet with the "Neuro-Interventional Neurosurgery team as part of the decision" and that plaintiff was "clinically stable with no deterioration in his condition and no new symptoms."  T. 395.

On June 25, 2008, plaintiff reported to Michael S. Rhee, M.D., a neurosurgeon, that he was having headaches.  T. 394.  Dr. Rhee planned to make arrangements for plaintiff to "meet

with the interventional neurologist and make part of the decision regarding management of his

aneurysm." T. 394.  Dr. Rhee noted that plaintiff "probably will opt for interventional coiling . . .

of this . . . aneurysm." T. 394.

### III.    ADMINISTRATIVE HEARING

On July 7, 2008, the ALJ held a hearing via videoconference. T. 403. The ALJ was at the

Social Security Administration Office of Hearings and Appeals in Syracuse, New York. T. 403.

Plaintiff's attorney, Laura Weekly, and the vocational expert, David Festa, were present with the

ALJ in Syracuse. T. 403. Plaintiff appeared by videoconference from Ogdensburg Correctional

Facility in Ogndensburg, New York. T. 403. David Weiss, M.D., the medical expert, listened

and testified over the telephone. T. 407. Dr. Weiss had difficulty hearing plaintiff throughout the

hearing. T. 409, 422.

Plaintiff testified that in 2005, he was employed by CNY Outsourcing to do manual labor

for eight to nine months. T. 410. Plaintiff stated that he stopped working in 2006 because of

back problems. T. 410. Plaintiff testified that he cannot work because back pain prevents him

from sitting and standing for long periods of time and makes it difficult to walk. T. 411. Plaintiff

stated that the left side of his body is numb and he cannot "hold anything" in his "left hand for

periods of time". T. 411. Plaintiff also stated that he gets sharp pains in his left hand and will "be

dropping objects" so he holds things, i.e., "coffee or tea", with his right hand. T. 416-17.

Plaintiff testified that he has worn a knee brace daily since 2004 because his knee "gives

out" on him "when going up or down stairs or just generally walking." T. 411. Plaintiff stated

that he has knee pain when going up and down stairs and walking. T. 414.

Plaintiff stated he had a brain aneurysm "that may be" causing him "problems such as

short-term memory loss". T. 411. Plaintiff testified that he was "waiting now to have a surgery done" on the aneurysm. T. 415.

Plaintiff testified that he is blind in his left eye. T. 411. Plaintiff stated that he has constant pain in his left eye for which he takes Pred Forte. T. 413. "[M]ost of the time", however, the medication does not help, T. 413, and if he forgets to take it he gets "sharp pains" in his left eye, it starts to drain," and he gets "a bad headache that makes it hard" for him to see. T. 411. Plaintiff testified that he has "periods of vision loss when reading or watching TV for short periods of time". T. 411. Plaintiff explained that although he spends "probably about an hour, hour and a half" reading each day, he reads in intervals because after ten to fifteen minutes he "start[s] seeing doubles", has difficulty "focus[ing] on letters and words" and gets a headache. T. 413. Plaintiff testified that, at that point, he puts "the book down, and pick[s] it up probably two or three hours later." T. 417. Plaintiff stated that the headache lasts "probably about a half hour, because I usually lay down, and I go to sleep." T. 413.

Plaintiff stated that while in jail, he had been assigned a job as a facilitator which requires him to "stand up in front of the class about 15 or 20 minutes" and gives information to other inmates that "could be helpful for them . . . once they're released." T. 415. Plaintiff testified that his health problems have not prevented him from doing his job because the class is only two hours, he only has to stand for five to ten minutes and he has "other guys" help him. T. 415-16. Plaintiff stated that he has been "sent back" from the class when his back "gets really bad". T. 416.

Before facilitating the class, plaintiff had a job for "about 90 days" as "the gym rec aide" which required him to pass out basketballs. T. 416. Plaintiff testified he had to stand up for

18

"about five minutes" and then would sit down.  T. 416.

Since the medical expert, Dr. Weiss, "could not understand most of [plaintiff's]

responses" during the hearing, T. 422, the ALJ gave him the following summary:

> With regard to his orthopedic problems, he testified, when he was out of prison, he
> was taking hydrocodone, Percocet; he tried a TENS unit; did some physical therapy.
> his pain, he described as a seven to eight out of a 10, which varied.  He has pain in his
> leg, but doesn't know if it's related to the back.

T. 422.  The ALJ also told Dr. Weiss that plaintiff had complained of right knee pain and

numbness on "his entire left side", T. 427, as well as an inability to hold objects with his left

hand. T. 428.  Dr. Weiss asked whether there had been any electrodiagnostic studies of plaintiff's

upper or lower extremities.  T. 428.  Dr. Weiss explained that "what's missing to support his

contentions of" reduced strength in the extremities was "electrodiagnostic studies of the upper

and lower extremities" which would "support subjective complaints concerning sensation and

motor power, for instance, in the left hand that's [sic] he's dropping things, and that he has

alleged decreased sensation."  T. 432.

Dr. Weiss diagnosed "internal derangement of the right knee", "herniated disc at L4-5,

with facet disease in the lower back", and "bulging with mild stenosis at C3-4 and 5-4 without

cord compression."  T. 433. Dr. Weiss also noted that the MRI of plaintiff's lumbar spine which

showed "degenerative disc disease, facet arthritis, and spondylolisthesis at L5-S1" as well as

"some bulging and left foraminal stenosis at L5-S1."  T. 433.  Dr. Weiss stated that he did not

believe plaintiff's lumbar spine condition met or equaled the listing criteria of 1.04 because "we

don't have full-fledged support of nerve root compression" which "would be found in

electrodiagnostic studies."  T. 434.  Dr. Weiss testified that in his opinion, plaintiff could perform

the physical demands of sedentary work.  T. 436.

19

The ALJ also elicited testimony from the vocational expert regarding the kind of work, if any, plaintiff could perform despite his limitations, by presenting this hypothetical question:

> Q    So we're dealing with an individual . . . between the ages of 38 and 43, a high school education, no past relevant work.  The person is limited to the full range of sedentary work . . . .  He can lift or carry 10 pounds frequently, less than 10 pounds occasionally, sit for six hours, walk or stand for two hours.  Now, he is blind in one eye, and therefore, he should not be involved in work that would be hazardous to the remaining vision . . . .  Is there any work such an individual could do?
>
> . . . .
>
> A    Was there any problem with the good eye?
>
> Q    No.

T. 441-42.  The vocational expert testified that such an individual could perform work as a "preparer", "lens inserter", or "final assembler", all of which are sedentary, unskilled, "production work jobs."  T. 442.

Plaintiff's representative asked the vocational expert to consider the hypothetical question provided by the ALJ but also to assume that "the vision in the remaining eye is limited" and that "after a half hour of use, [the individual] must take a two-hour break."  T. 442.  The vocational expert testified that such an individual could not perform the jobs he identified, which required "the same amount of concentrated use of your eyes as you might find in reading", T. 443, or any other job, because an individual who needed a two-hour break after using his vision for a half an hour "would not be able to work on a full-time consistent basis."  T. 442.

## IV.    ALJ'S DECISION

To be eligible for Social Security disability benefits, a claimant must establish  "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating

disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

The ALJ found at step one that plaintiff engaged in substantial gainful activity for eight or

nine months beginning in 2005 but that he has not engaged in substantial gainful activity during

any other relevant time period. T. 20.

At step two, the ALJ found that plaintiff "has the following 'severe' impairments:

blindness of the left eye, internal derangement of the right knee, and facet disease of the

lumbosacral spine. T. 21. The ALJ noted that there was evidence in the record that plaintiff's

physicians had diagnosed depressive disorder, bulging cervical discs with "mild canal stenosis",

and a right carotid artery aneurysm. T. 21. The ALJ found, however, that these conditions were

not "severe" because there was no evidence that they imposed any limitations on plaintiff's

functioning. T. 21.

At step three, the ALJ found that plaintiff did not "have an impairment or combination of

impairments that meets or medically equals one of the listed impairments." T. 28.

At step four, the ALJ found that plaintiff had the residual functional capacity to perform sedentary work that could "be safely performed by an individual who is blind in the left eye." T. 22. The ALJ further found that because plaintiff's past relevant work included various forms of manual labor which required greater than sedentary exertion he could not "perform any past relevant work". T. 24.

At step five, the ALJ considered plaintiff's age, education, work experience, residual functional capacity, and nonexertional limitations, and, relying on the testimony of the vocational expert, found that there was "other work existing in significant numbers in the national economy" that plaintiff could perform. T. 25. The ALJ therefore found that plaintiff was "not disabled." T. 25.

## V.    DISCUSSION

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether plaintiff is disabled. Rather, the Court must examine the administrative transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw*, 221 F.3d at 131; *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted)). An ALJ is obligated to develop the record regardless of whether claimant is represented by counsel. *See Shaw*, 221 F.3d at 131.

### A.    Duty to Develop the Administrative Record

Plaintiff claims that the ALJ failed to develop the administrative record because she did

seek assessments of plaintiff's residual functional capacity from his treating sources.  Since

Social Security proceedings are non-adversarial in nature, the ALJ has a "'duty to investigate and

develop the facts and develop the arguments both for and against the granting of benefits.'"  *Butts*

*v. Barnhart,* 388 F.3d 377, 386 (2d Cir. 2004) (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir.

2001)).  The ALJ is under this obligation even when the claimant is represented by counsel.  *See*

*Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("[T]he ALJ [must] affirmatively develop the

record ... even when, as here, the claimant is represented by counsel.") (quotations and citations

omitted)).  The duty of an ALJ to develop the record is "particularly important" when obtaining

information from a claimant's treating physician due to the "treating physician" provisions in the

regulations.[5]  *Devora v. Barnhart*, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002).  "There is ample case

law suggesting that an ALJ has an independent duty to make reasonable efforts to obtain a report

prepared by a claimant's treating physician in order to afford the claimant a full and fair hearing."

*Devora*, 205 F.Supp. 2d at 174 (collecting cases).  This obligation includes obtaining the treating

physicians' assessments of plaintiff's functional capacity.  20 C.F.R. § 404.1512(e); *see also*

*Hardhardt v. Astrue*, No. 05-CV-2229, 2008 WL 2244995, at *9 (E.D.N.Y. May 29, 2008).

     The Regulations state, in relevant part: "Before we make a determination that you are not

disabled, we will develop your complete medical history ... [and] will make every reasonable

effort to help you get medical reports from your own medical sources when you give us

permission to request the reports."  *Pabon v. Barnhart*, 273 F.Supp.2d 506, 517 (S.D.N.Y. 2003)

---

     [5] Under the regulations, a treating source's opinion is entitled to controlling weight if
well-supported by medically acceptable clinical and laboratory diagnostic techniques and is
consistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2),
416.927(d)(2).

(citing 20 C.F.R. § 416.912(d)); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand

is necessary if the ALJ fails to attempt to contact the plaintiff's treating physician to properly

determine her RFC.  *See Rosa v. Apfel,* No. 97 Civ. 5831, 1998 WL 437172, at *4 (S.D.N.Y. Jul.

31, 1998); *see also Hopper v. Comm'r of Social Sec.*, 7:06-cv0038, 2008 WL 724228, at *11

(N.D.N.Y. Mar. 17, 2008); *see also Oliveras ex rel. Gonzalez v. Astrue*, No. 07 Civ. 2841, 2008

WL 2262618, at *6-7 (S.D.N.Y. May 30, 2008) (holding that remand is appropriate even where

there is no guarantee that the outcome will change, so that the ALJ can make reasonable efforts to

obtain the treating physicians opinion on functional capacity).

Although plaintiff's back condition was treated by a number of physicians at the

Orthopedic-Spine Clinic between 2004 and 2006, there is no indication that the ALJ requested a

residual functional capacity evaluation from any physician at this clinic.  Nor is there any

indication in the record that the ALJ requested a residual functional capacity evaluation from any

of the ophthalmologists who had treated plaintiff or a consultative examination or evaluation by

an ophthalmologist.[6]  Plaintiff's back and visual impairments are the crux of his disability claim.

Thus, remand is required to enable the ALJ to further develop the record and attempt to obtain

residual functional capacity statements from the Orthopedic-Spine Clinic and plaintiff's eye

doctors.

Plaintiff also argues that the ALJ should have contacted plaintiff's treating physicians to

determine whether the knee brace that plaintiff wore daily was a medically necessity and to obtain

their opinion as to how far he could ambulate.  Dr. Scerpella, the orthopedic surgeon who treated

---

[6]The initial remand from the Appeals Council instructed the ALJ to gather additional
evidence concerning plaintiff's physical impairments, including, "if warranted and available,
consultative . . . ophthalmological examinations and medical source statements about what the
claimant can still do despite the impairment."  T. 98.

his knee, completed a residual functional capacity evaluation specifically addressing the

limitations plaintiff had as a result of his knee impairment following surgery.  T. 296.  Therefore,

the ALJ was under no obligation to develop the record further as to plaintiff's knee.

Plaintiff further asserts that despite the testimony at the hearing by Dr. Weiss, the medical

expert, that electrodiagnostic studies were necessary to evaluate plaintiff's impairments, the ALJ

failed to order them, and thus neglected her duty to develop the administrative record.  An ALJ

has discretion in deciding whether to order a consultative examination at government expense. 20

C.F.R. § 416.917 ("we may ask you to have one or more physical or mental examinations or

tests").  The medical expert, Dr. Weiss, referred to the absence of electrodiagnostic studies eight

times during his testimony, commenting that they were necessary, T. 426, 432, "to support

subjective complaints concerning sensation and motor power, for instance, in the left hand, and

that he has alleged decreased sensation."  T. 432, 434, 438, 439.  Moreover, Dr. Potter, an

orthopedist who treated plaintiff at the Orthopedic-Spine Clinic included an "EMG" --

electromyography, an electrodiagnostic test, in his treatment plan.  T. 382.  There is nothing in the

record that suggests this test was performed.  Since the Court is remanding this action for further

development of the record, the ALJ may wish to consider whether electrodiagnostic studies

would be helpful to the determination of plaintiff's disability claim.

**B.      Evaluation of Medical Sources**

**1.      Medical Expert - Dr. Weiss**

In her decision, the ALJ stated that: "In evaluating the opinion evidence, the undersigned

has given the greatest weight to Dr. Weiss' opinion that the claimant can perform sedentary work

because Dr. Weiss was able to review the longitudinal medical evidence."  T. 24.  Plaintiff argues

that the ALJ erred when she accorded "the greatest weight" to Dr. Weiss's opinion because Dr. Weiss did not have plaintiff's complete medical record when he rendered his opinion, never examined plaintiff, and could not hear plaintiff's testimony at the hearing.

As an initial matter, plaintiff correctly asserts that Dr. Weiss did not have Exhibit 30F, when he testified at the hearing. Exhibit 30F, however, contains records regarding the aneurysm in plaintiff's brain. Since Dr. Weiss, an orthopedist, was testifying solely about plaintiff's orthopedic issues, the absence of records regarding the aneurysm was harmless.

Further, although Dr. Weiss did not examine plaintiff, a non-examining source's opinion "may even override [a] treating source's opinions provided they are supported by evidence of record." *See Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir.1995). Thus, the ALJ did not commit legal error by relying on the opinion of a non-examining source.

Plaintiff's last argument, however, has merit. The hearing transcript demonstrates that Dr. Weiss had difficulty hearing and understood little, if any, of plaintiff's testimony. *See* T. 408 ("I didn't hear Mr. Smith."); T. 409 ("I didn't hear Mr. Smith's response."); T. 422 ("I could not understand most of Mr. Smith's responses."). Indeed, the Commissioner does not contend otherwise. Thus, Dr. Weiss's opinion was based on an incomplete record. As stated, the Court is remanding this matter so the Commissioner can attempt to obtain residual functional capacity assessments from plaintiff's treating physicians. Upon receipt of these opinions, the Commissioner should re-evaluate the appropriate weight to which each medical opinion, including Dr. Weiss's, is entitled.

### 2.   Physician Assistant

Plaintiff asserts that the ALJ applied the wrong legal standard when assigning "limited

weight" (T. 22), to the opinion of Heather Crandell, the physician assistant who, along with Dr. Scerpella, treated his knee condition.  A physician assistant is defined as an "[o]ther source" whose opinion may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight.  20 C.F.R. § 416.913(d)(1).  The ALJ, therefore, committed no error in assigning limited weight to Crandell's opinion.  Moreover, Crandell rendered her opinion before plaintiff had knee surgery and there is evidence in the record, based on Dr. Scerpella's residual functional assessment, who performed the surgery, that plaintiff's functional abilities *improved* after surgery.  *See* T. 296-300.  Thus, the ALJ's decision to assign limited weight to Crandell's opinion is supported by substantial evidence.

### 3.    Physical Therapists

Plaintiff asserts that the ALJ's decision to accord no weight to the opinions of plaintiff's physical therapists was erroneous.  The regulations do not include physical therapists as "acceptable medical source[s]".  20 C.F.R. § 416.913(a) ("Acceptable medical sources are . . physicians . . . psychologists . . optometrists . . . podiatrists . . and . . . speech-language pathologists").  Rather, they are "[o]ther sources", 20 C.F.R. § 416.913(d)(1), whose opinions the ALJ "may use" to determine the severity of the impairment at issue.  *Id*.  Although there are physical therapy records in the Administrative Transcript, the evaluations recount plaintiff's subjective complaints and do not appear to set forth any professional opinion regarding plaintiff's limitations.  *See* T. 309-10; 337-45.  Accordingly, the ALJ did not err in declining to accord weight to plaintiff's physical therapy records.

### C.    Credibility and Vocational Expert

Plaintiff contends that the ALJ did not apply the correct legal analysis when evaluating

27

and rejecting his subjective complaints of pain.  When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  As stated above, the Court is remanding this matter for further development of the record.  Thus, re-assessment plaintiff's credibility in light of any additional medical opinion evidence will be required.  Accordingly, the Court need only address one of plaintiff's arguments on the issue of credibility.

Plaintiff argues that the ALJ should have credited his testimony that the loss of vision and continuous pain in his left eye make it impossible to sustain concentrated visual activity for more than fifteen minutes at a time because his head starts to aches and he needs rest to recover.  In this case, the ALJ made *no finding* on the credibility of plaintiff's assertion of visual limitations.  *Cf.*, *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987) (When rejecting subjective complaints of pain, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief [.]").  Compounding this error, to sustain the Commissioner's burden at the fifth step of the disability determination, *see* 20 C.F.R. §§ 416.920, 416.960 (at the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity), the ALJ relied on the vocational expert's testimony that, assuming plaintiff could use his right eye without limitation, there were several jobs in the economy he could perform.  *See, e.g., Bapp*, 802 F.2d at 603 (when non-exertional impairments limit the range of work a claimant can perform the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence)

that jobs exist in the economy which claimant can obtain and perform.").   The vocational expert

also testified, however, that *no jobs* existed in the economy for a person with plaintiff's exertional

and alleged visual limitations.  If a hypothetical question does not include all of a claimant's

impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's

response cannot constitute substantial evidence to support a conclusion that the claimant is not

disabled.  *Melligan v. Chater*, No. 94-CV-944S, 1996 WL 1015417, at *8 (W.D.N.Y. Nov. 14,

1996).  Consequently, the ALJ erred when she relied on the vocational expert's response to her

hypothetical question without first making a finding regarding the credibility of plaintiff's

testimony about his visual limitations.  *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)

(stating that testimony of a vocational expert is only useful if it addresses the particular

limitations of the claimant)*;see also Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)

(there must be "substantial evidence to support the assumption upon which the vocational expert

based his opinion.").  Accordingly, on remand, the ALJ must address plaintiff's testimony about

his visual limitations.[7]

**VI.     CONCLUSION**

           For the foregoing reasons, it is hereby

           **ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 10)

is **DENIED**; and it is further

           **ORDERED** that plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is

**GRANTED**; and it is further

---

           [7]A consultative ophthalmologic examination, as suggested by the Appeals Council, might
aid in this determination.  T. 98.

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter

be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings

consistent with the above; and it is further

**ORDERED** that judgment be entered for Plaintiff; and it is further

**ORDERED** that the Clerk of the Court close this case.

**IT IS SO ORDERED.**

DATED: Syracuse, New York
         September 12, 2012

_____
Honorable Norman A. Mordue
U.S. District Judge

30